# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2022 CA 0976

## PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS

### VERSUS

## BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND THOMAS GALLIGAN, INDIVIDUALLY AND IN HIS CAPACITY OF PRESIDENT OF LOUISIANA STATE UNIVERSITY

*DATE OF JUDGMENT:* **SEP 1 9 2023**

ON APPEAL FROM THE NINETEENTH JUDICIAL DISTRICT COURT
PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA
NUMBER 702660, SECTION 25

HONORABLE WILSON E. FIELDS, JUDGE

\* \* \* \* \* \*

| | |
|---|---|
| Alysson L. Mills<br>Kristen D. Amond<br>New Orleans, Louisiana | Counsel for Plaintiff-Appellee<br>People for the Ethical Treatment<br>of Animals |
| Winston G. DeCuir, Jr.<br>Carlton "Trey" Jones, III<br>Johanna A. Posada<br>Baton Rouge, Louisiana | Counsel for Defendants-Appellants<br>Board of Supervisors of Louisiana<br>State University and Thomas C.<br>Galligan, Individually and in his<br>Capacity as Former Interim President |
| Sheri M. Morris<br>Christina Berthelot Peck<br>Katelin Hughes Varnado<br>Evan P. Fontenot<br>Baton Rouge, Louisiana | of Louisiana State University |

\* \* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**Disposition: REVERSED IN PART; AFFIRMED AS AMENDED IN PART. RELIEF REQUESTED IN ANSWER DENIED.**

**CHUTZ, J.**

Defendants-appellants, Board of Supervisors of Louisiana State University and Thomas C. Galligan, individually and in his capacity as an interim president of Louisiana State University (collectively LSU), appeal the trial court's judgment, ordering LSU to produce to plaintiff-appellee, People for the Ethical Treatment of Animals (PETA), records related to the use of birds in research at LSU that PETA requested pursuant to the Louisiana Public Records Law. We reverse in part and affirm as amended in part. Additionally, we deny the relief requested in PETA's answer.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 30, 2019, PETA made its **first public records request** (PRR) of LSU for veterinary care and disposition records for birds used in the lab of Christine Lattin, an associate professor in the Department of Biological Sciences, from September 1, 2018 (veterinary care or animal use records). On June 7, 2019, LSU responded but because the requested records had not been produced, PETA made a **second PRR** of LSU, seeking the same information on August 5, 2019, which included any records that had come into existence subsequent to May 30, 2019 (veterinary care or animal use records). Assistant General Counsel Johanna A. Posada responded by email that same day that it was "doubtful" anything had changed, but she would contact Dr. Lattin and advise PETA. PETA did not receive a follow-up response from LSU. PETA again requested the same veterinary care and disposition records (veterinary care or animal use records), along with acquisition records, in a **third PRR** made to LSU on March 17, 2020. A **fourth PRR**, dated April 15, 2020, again sought veterinary and disposition records gathered in Dr. Lattin's lab, expressly identifying those from January 1, 2020 onward (veterinary care or animal use records).

2

On May 5, 2020, PETA made a **fifth PRR** of LSU for correspondence from September 1, 2018 onward, seeking correspondence between any LSU employees and representatives of the City of Baton Rouge and the City's Animal Control & Rescue Center, as well as between LSU employees and Dr. Lattin, related to plans by Dr. Lattin to trap or experiment on birds for her research (trapping records). A week later, on May 12, 2020, PETA made its **sixth PRR**, requesting videographic records related to Dr. Lattin's experiments funded by a specified grant as well as inventories of photographic and videographic records produced and maintained by LSU depicting Dr. Lattin's use of animals in experiments and research (videographic records). A **seventh PRR**, dated June 9, 2020, was directed to LSU by PETA, eliciting records pertaining to the amendment of Section 14:401 of the Code of Ordinances of the City of Baton Rouge and Parish of East Baton Rouge (Section 14:401), creating an exemption to the ban on trapping, shooting, or molesting of wild birds in the City of Baton Rouge (records of the amendment to the City's ordinance).[1]

On December 15, 2020, PETA filed a petition for a writ of mandamus, declaratory judgment, and injunctive relief pursuant to the Public Records Law, naming LSU as defendant and averring entitlement to relief, directing LSU to immediately produce for inspection and copying all of the information identified in the PRRs. According to PETA's allegations, LSU failed to produce all records responsive to its seven PRRs and, therefore, after a hearing, PETA was entitled to a writ of mandamus or, alternatively, either a declaratory judgment or an injunction.

---

[1] It is undisputed that in 2019, the Code of Ordinances of the City of Baton Rouge and Parish of East Baton Rouge provided in Section 14:400: "The area within the corporate limits of the City of Baton Rouge as they now exist or may hereafter be amended from time to time is hereby designated as a bird sanctuary." According to the salient provisions of Section 14:401, "[w]ithin the corporate limits of the city it shall be unlawful to trap, hunt, shoot or molest in any manner any bird or wildfowl or to rob bird nests or wildfowl nests." The parties do not dispute the amendment allowed an exception to the prohibition for research purposes.

Additionally, PETA sought damages, civil penalties, reasonable attorney fees, and costs. LSU answered the lawsuit, generally denying PETA's allegations. LSU also asserted that some of the information that PETA requested was not required to be produced since it was generated in accordance with federal law and, therefore, outside the ambit of the Public Records Law or because it was expressly exempt from production under the Public Records Law. LSU also claimed its production of PRR responses and timeliness was appropriate considering the extraordinary circumstances of the gubernatorially declared health emergency due to COVID-19.

On May 12, 2021, PETA filed a supplemental petition, wherein it noted that on April 9, 2021, subsequent to filing its lawsuit, it made an **eighth PRR** of LSU, again seeking all photographs and videographic records of birds held or used by Dr. Lattin from September 1, 2019, until the date LSU fulfilled the request (videographic records) as well as all veterinary care records for birds held or used in Dr. Lattin's lab. PETA noted that on April 26, 2021, LSU responded with an assertion that the requested records were exempt from disclosure. For LSU's failure to provide all records responsive to PETA's eighth PRR, PETA sought a mandamus directing LSU to provide all responsive records as well as civil penalties, reasonable attorney fees, and costs. LSU answered the supplemental petition, denying the allegations.

Cross motions for summary judgment asserted by PETA and LSU were denied by the trial court. Thereafter, on December 14, 2021, the matter proceeded to a hearing on PETA's petition. After the receipt of documentary and testimonial evidence, the trial court took the matter under advisement and, on January 11, 2022, issued an oral ruling in favor of PETA, granting all the records PETA requested in its PRRs. The issues of PETA's entitlement to damages, civil

4

penalties, reasonable attorney fees, and costs were reserved for a later date. From a judgment issued in conformity with the trial court's oral ruling, LSU appeals.[2]

## PUBLIC RECORDS LAW

The right of access to public records is guaranteed by the Constitution and the Public Records Law. La. Const. art. XII, § 3; La. R.S. 44:1-67.2. Any person may obtain a copy of any public record, in accordance with the Public Records Law, except as otherwise provided by that or other specific law. See La. R.S. 44:31(B). These constitutional and statutory rights of access to public records should be construed liberally, and any doubt must be resolved in favor of the public's right to see. *Brumfield v. Village of Tangipahoa*, 2021-0082 (La. App. 1st Cir. 12/20/21), 340 So.3d 221, 228.

Access can be denied only when a law specifically and unequivocally provides to the contrary. *McKay v. State, Div. of Admin.*, 2013-1265 (La. App. 1st Cir. 3/21/14), 143 So.3d 510, 514. Whenever there is doubt as to whether the public has the right of access to certain records, the doubt must be resolved in favor of the public's right to see. To allow otherwise would be an improper and arbitrary restriction on the public's constitutional rights. *Shane v. Parish of Jefferson*, 2014-2225 (La. 12/8/15), 209 So.3d 726, 735. There was no intent on the part of the legislature to qualify, in any way, the right of access. *Stevens v. St.*

---

[2] The trial court signed two judgments on February 3, 2022, purportedly in conformity with its oral rulings. LSU appealed both judgments. On LSU's motion, this court ordered the consolidation of 2022-CA-0977 with this appeal for oral argument and submission. See *People for the Ethical Treatment of Animals v. Bd. of Supervisors of Louisiana State Univ.*, 2022-0976, 2022-0977 (La. App. 1st Cir. 12/02/22) (unpublished order). Because neither judgment, without reference to the actual discovery requests themselves, was precise, definite, and certain, neither constituted an appealable judgment. The trial court subsequently signed a single judgment on June 15, 2023, specifying the precise, definite, and certain records LSU is directed to produce, in accordance with this court's interim order. See *People for the Ethical Treatment of Animals v. Bd. of Supervisors of Louisiana State Univ.*, 2022-0976, 2022-0977 (La. App. 1st Cir. 5/15/23) (unpublished order). It is the June 15, 2023 judgment, designated as final by the trial court, that we review in this appeal.

5

*Tammany Parish Gov't*, 2017-0959 (La. App. 1st Cir. 7/18/18), 264 So.3d 456, 461, writ denied, 2018-2062 (La. 2/18/19), 265 So.3d 773.

All records, writings, letters, recordings, or any other documentary materials, regardless of physical form or characteristics, having been used, being in use, or prepared, possessed, or retained for use in the conduct, transaction, or performance of any business, transaction, work, duty, or function which was conducted, transacted, or performed by or under the authority of the constitution or laws of this state are "public records," except as otherwise provided in the Public Records Law or the Constitution of Louisiana. See La. R.S. 44:1(A)(2)(a). The term "public body" includes any instrumentality of state government. La. R.S. 44:1(A)(1); *Brumfield*, 340 So.3d at 228. It is undisputed that LSU is a public body.

The Public Records Law is enforced through the procedure set forth in La. R.S. 44:35. Under this statute, "[a]ny person who has been denied the right to inspect, copy, reproduce, or obtain a copy or reproduction of a record under the provisions of [the Public Records Law] either by a determination of the custodian or by the passage of five days ... from the date of his in-person, written, or electronic request ... may institute proceedings for the issuance of a writ of mandamus, injunctive, or declaratory relief." La. R.S. 44:35(A). In such a suit, "the court has jurisdiction to ... issue a writ of mandamus ordering the production of any records improperly withheld from the person seeking disclosure," and "[t]he court shall determine the matter de novo." La. R.S. 44:35(B). "The burden of proving that a public record is not subject to inspection, copying, or reproduction shall rest with the custodian." La. R.S. 44:31(B)(3) & 44:35(B); *Talley v. Louisiana Dep't of Transp. & Dev.*, 2022-0983 (La. App. 1st Cir. 2/24/23), 361 So.3d 1041, 1050, writ denied, 2023-00557 (La. 6/7/23), 361 So.3d 976.

6

Generally, an appellate court reviews a trial court's judgment seeking the production of public records under an abuse of discretion standard. See *Talley*, 361 So.3d at 1050.[3] In addition, a trial court's factual findings in such a proceeding are subject to a manifest error standard of review. However, questions of law such as the proper interpretation of a statute or the applicability of a particular exception, exemption or limitation to the Public Records Law, are reviewed by appellate courts under the de novo standard of review. *Talley*, 361 So.3d at 1050.

**The Veterinary Care/Animal Use Records:**

LSU maintains that the veterinary care/animal use records are not "public records" under the Public Records Law. It is undisputed that the records PETA sought in its first, second, third, fourth, and eighth PRRs, which the parties referred to interchangeably as the veterinary care or animal use records, consisted of daily observation reports, daily health check records, veterinarian's records, adverse event reports, medical care records, cage cards, and disposition records for birds held in Dr. Lattin's lab. Because this involves a question of interpretation of the statute defining "public records" under La. R.S. 44:1(A)(2)(a), we review the trial court's conclusion de novo. See *Talley*, 361 So.3d at 1050.

LSU qualifies as a "research facility" under the provisions of the Animal Welfare Act (AWA). Under federal law, a research facility is required to establish a committee to monitor compliance with federal regulations.[4] The Institutional Animal Care and Use Committee (IACUC) was created pursuant to and exists

---

[3] The specific relief before the *Talley* court was petitioner's entitlement to a writ of mandamus. In its prayer, the injunctive relief PETA alternatively sought was a mandatory injunction requiring LSU to produce the requested records. In rendering its orders, the trial court did not specify whether it was granting the writ of mandamus or a mandatory injunction. Regardless, the standard of review is the same. See *Terrebonne Par. Consol. Gov't v. Carter*, 2019-1390 (La. App. 1st Cir. 9/18/20), 313 So.3d 1016, 1020 ("Whether to grant or deny a preliminary injunction rests within the sound discretion of the trial court.").

[4] See 7 U.S.C. § 2132(e). See also Health Research Extension Act of 1985, 42 U.S.C. § 289d(b)(1).

7

because of federal laws and regulations. IACUC is accountable only to the National Institutes of Health (NIH) and the United States Department of Agriculture. It is not accountable to LSU and its authority is not derived from the LSU Board of Supervisors. If the IACUC determines that a proposed research project involving animal use does not adhere to federal animal use regulations, the project is not considered by the NIH or other governmental agencies for possible federal funding. No LSU or other state official or body has authority to countermand or reverse an adverse finding by the IACUC disapproving a research proposal. If a researcher is turned down by the IACUC, he may appeal to federal officials, but not to state officials. Thus, the IACUC at LSU was created by order of the federal government, for the purpose of ensuring that federal requirements are met and is accountable only to federal authorities. No state regulations govern the conduct of IACUC activities. The fact that the entity monitored by the IACUC is a state entity does not change the federal nature of the IACUC. *Dorson v. State*, 94-1591 (La. App. 4th Cir. 6/29/95), 657 So.2d 755, 756-57, writ denied, 95-1951 (La. 11/13/95), 662 So.2d 472.

According to federal law, IACUC shall maintain minutes of IACUC meetings; records of proposed activities involving animals and proposed significant changes in activities involving animals, and whether IACUC approval was given or withheld; and records of semiannual IACUC reports and recommendations.[5] Thus, because these IACUC records were created pursuant to federal mandate, they are not "public records" subject to the Public Records Law

---

[5] See 9 C.F.R. § 2.35. See also 9 C.F.R. § 2.31(c)(1) & (2) "With respect to activities involving animals, the IACUC, as an agent of the research facility, shall ... [r]eview, at least once every six months, the research facility's program for humane care and use of animals...; [and] [i]nspect, at least once every six months, all of the research facility's animal facilities."

but rather records subject to the Freedom of Information Act of the federal government.[6] See *Dorson*, 657 So.2d at 757.

In this appeal, LSU asks that the holding in *Dorson* be extended to exclude from the definition of "public records" those records maintained as part of LSU's animal care and use program. Therefore, according to LSU, it was not required to produce the veterinary care records requested by PETA.

Dr. Rhett Stout is an LSU employee who serves as, among other things, the alternating veterinarian of IACUC. He testified that in his capacity as the alternating veterinarian of IACUC, he is required to oversee research animals. He stated that the animal care and use program is part of the federal guidelines. Dr. Stout described that the animal care and use program included daily care of animals: feeding, watering, walking, brushing, grooming, and trimming toenails. It also encompassed the veterinarian care and environmental conditions such as housing, temperature, humidity levels, and size of the cage. Dr. Stout explained that IACUC assumes animals are being fed and watered daily but has an obligation to inspect labs with animals twice a year at which time it may—but does not necessarily—look at the lab's animal care and use program records. Dr. Stout admitted that IACUC does not generate or "possess" the records, inasmuch as they are not transmitted from the researcher's lab to IACUC. But he testified the data collected in the animal care and use program are requirements of federal law to which LSU, as a research facility, is subjected.

LSU maintains that it has demonstrated that the veterinary care records PETA seeks were used, prepared, possessed, and retained for use in the performance of its research solely under authority of federal law rather than

---

[6] See 5 U.S.C.A. § 552.

9

pursuant to state law. As such, LSU asserts that they are not public records under the Public Records Law, irrespective of whether they are IACUC records.

Congress enacted the AWA, set forth in 7 U.S.C.A. § 2131-2160, in order to, among other things, ensure that animals intended for use in research facilities are provided humane care and treatment, expressly finding it is essential to regulate the care, handling, and treatment of animals by persons or organizations engaged in using them for research or experimental purposes. See 7 U.S.C.A. § 2131. Under the AWA, an "animal" means any live or dead warm-blooded animal being used, or intended for use, for research. See 7 U.S.C.A. § 2132; 9 C.F.R. § 1.1. Thus, birds fall within the scope of the AWA.[7] The Secretary of Agriculture of the United States (the Secretary) is authorized to promulgate rules, regulations, and orders he deems necessary in order to effectuate the purposes of the AWA. See 7 U.S.C.A. § 2151.[8]

Although the Secretary has duly promulgated regulations setting forth minimum standards that a research facility must maintain,[9] unlike the IACUC records at issue in *Dorson*, 657 So.2d at 756-57, which must be maintained by federal mandate, LSU has not pointed to, and we have not found, any federal law or regulation mandating that a research facility like LSU actually maintain records of its implementation of the AWA standards, i.e., the veterinary care or animal use records. Therefore, while the AWA requires research facilities to comply with

---

[7] Although the definitions of "animal" provided in 7 U.S.C.A. § 2132 and 9 C.F.R. § 1.1 exclude birds bred for use in research, because Dr. Lattin caught wild birds for use in her research, that exclusion is inapplicable under the facts of this case.

[8] The Secretary shall promulgate standards to govern the humane handling, care, and treatment of animals by research facilities. These standards include minimum requirements for the handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species. In addition, with respect to animals in research facilities, the standards shall include requirements for animal care, treatment, and practices in experimental procedures to ensure that animal pain and distress are minimized, including adequate veterinary care. See 7 U.S.C.A. § 2143(a)(1), (2)(A), & (3)(A).

[9] See 9 C.F.R. § 2.33.

10

minimum standards, nothing in the AWA mandates that LSU maintain the records it keeps.

LSU, the premier flagship university for the state, operates under the supervision and management of the Board of Supervisors of LSU (the Board of Supervisors). See La. R.S. 17:3215(1). Among the duties of the Board of Supervisors is to actively seek and accept forms of financial assistance for educational purposes from any public or private person or agency and to comply with rules and regulations governing funding from the federal government or any other person or agency which are not in contravention of the constitution and laws. See La. R.S. 17:3351(A)(2).

Mindful that access to veterinary care and animal use records maintained by a public body like LSU in the performance of its work, duties, or functions can be denied only when a law specifically and unequivocally provides otherwise, we find that LSU has failed to identify any law denying the public such access. Moreover, LSU, through the Board of Supervisors, is required to ensure that recipients of private and federal funding comply with the rules and regulations governing that funding, which would necessarily include the minimum standards requirements of the AWA for the humane care and treatment of animals at research facilities. Therefore, the veterinary care records for birds held in Dr. Lattin's lab are not generated solely according to federal law. As such, they are subject to production under the Public Records Law. See and compare *Citizens for Alternatives to Animal Labs, Inc. v. Bd. of Trustees of State Univ. of New York*, 92 N.Y.2d 357, 360; 703 N.E.2d 1218, 1220 (1998) (research facility was subject to New York's public records law because it was fulfilling the university's mission to provide educational services to the people of the state by "facilitat[ing] basic and applied research for the purpose of the creation and dissemination of knowledge vital for

11

continued human [and] scientific ... advancement," citing Education Law §
351[c].). Accordingly, the trial court correctly ordered LSU to produce the animal
care records requested by PETA in its first, second, third, fourth, and eighth PRRs.

**The Videographic Records:**

LSU next challenges the trial court's order to produce video recordings
made by Dr. Lattin or others under her supervision. Insofar as the order of
production of the videographic records related to experiments carried out by Dr.
Lattin and funded by the grant "The Neurobiology of Resilience to Environmental
Challenges" as well as any inventories, indexes, or catalogs of photographic and
videographic records produced and maintained by LSU related to and/or depicting
Dr. Lattin's use of animals in experiments or research set forth in PETA's sixth
PRR dated May 12, 2020, LSU points out that the evidence established LSU has
responded to the request. Dr. Lattin testified that in responding to the sixth PRR,
she advised she had no videographic records related to the Board of Regents grant,
because it did not start until late summer/early fall of 2020. Therefore, she had no
video recordings responsive to PETA's May 12, 2020 PRR. Dr. Lattin also stated
that she did not keep inventories of videographic records in her lab and, thus, there
were no such records responsive to the sixth PRR.

This evidence was unrefuted and, on appeal, PETA does not suggest LSU's
response to the sixth PRR was incomplete or inaccurate. Because the record lacks
any evidence of any additional public records responsive to the sixth PRR so as to
support the trial court's order directing LSU to produce videographic records
funded by the "The Neurobiology of Resilience to Environmental Challenges"
grant or inventories, indexes, or catalogs of videographic records produced and
maintained by LSU related to and/or depicting Dr. Lattin's use of animals in

12

experiments or research, the trial court abused its discretion in so ordering. Accordingly, that portion of the trial court's order is reversed.[10]

LSU next contends that the trial court erred in ordering the production of all photographs and videographic records of birds held and/or used by Dr. Lattin or any other person under her supervision from September 1, 2019, apparently through the date of the PRR is fulfilled, as set forth in the eighth PRR dated April 9, 2021. The gist of LSU's contention is that these records are exempt from production under the Public Records Law. As such, our review of the trial court's conclusion that the exclusion is inapplicable to all of Dr. Lattin's video recordings is under a de novo standard. See *Talley*, 361 So.3d at 1050.

According to La. R.S. 44:4(16)(b), the Public Records Law does not apply to:

> Data, records, or information produced or collected by or for faculty or staff of state institutions of higher learning in the conduct of or as a result of, study or research on commercial, scientific or technical subjects of a patentable or licensable nature, whether sponsored by the institution alone or in conjunction with a governmental body or private concern, until such data, records, or information have been publicly released, published, or patented.

LSU asserts the videographic records PETA seeks in its eighth PRR are data, records, or information collected as a result of research on technical subjects of a patentable or licensable nature, which are exempt until publicly released, published, or patented.

Nothing in the Public Records Law defines "patentable or licensable nature." Thus, we turn to the ordinarily understood meaning of these words. See *Capital City Press, L.L.C. v. Louisiana State Univ. Sys. Bd. of Sup'rs*, 2013-2001 (La. App. 1st Cir. 12/30/14), 168 So.3d 727, 739, writ denied, 2015-0209 (La. 4/17/15),

---

[10] In reversing this order, we make no determination of whether LSU acted unreasonably or arbitrarily in responding to PETA's sixth PRR. See La. R.S. 44:35(E)(1).

168 So.3d 401 ("In interpreting statutes, the court must give the words of a law their generally prevailing meaning.").

"Patentable" is defined as "[c]apable of being patented." A "patent" is "[t]he governmental grant of a right, privilege, or authority" or "[t]he official document so granting." *Black's Law Dictionary* (11th ed. 2019). It is also "a government authority to an individual or organization conferring a right or title, [especially] the sole right to make, use, or sell some invention." *New Oxford American Dictionary* 1283 (3d Ed. 2010). Given the definition of "patentable," it logically follows that "licensable" means capable of being licensed. A "license" is defined as "a permit from an authority to own or use something [or] do a particular thing," or "formal or official permission to do something" *New Oxford American Dictionary*, at 1007. Finally, "nature" is recognized as "the basic or inherent features of something, [especially] when seen as a characteristic of it." *Id.*, at 1168. From these definitions, we distill that the meaning of "patentable or licensable nature" in La. R.S. 44:4(16)(b) refers to data, records, or information of the kind or class having basic or inherent features capable of the grant of the governmental right, privilege, or authority to receive a patent or capable of being given a permit or official permission to own, use, or do something. With these definitions in mind, we turn to the evidence admitted at trial.

In her testimony, Dr. Lattin explained the goal of her research is to better understand how stress response helps animals to successfully cope with different kinds of challenges they may encounter and how that response can go from being helpful to something that causes problems for them. She testified that her research involved neophobia wherein she used a video camera to record a bird in a cage eating or not eating food. Dr. Lattin stated that as of April 23, 2021, she had 647 hours of total videos. Some of those videos had been analyzed for various types of

14

behavior and that behavior data had been published. As such, she acknowledged that some of the videos had been published. According to Dr. Lattin, if she had to release all the videos, it would have a devastating impact on her research because other researchers could be able to use that released data and produce publications she was planning to produce. She also believed that her opportunities for licensing and commercial agreements could be limited by the release of her videos. Dr. Lattin stated that to patent or commercialize her data, she would have to consult with the Office of Research and Economic Development at LSU which she plans to do later but has not yet because she is still in the earlier stages of her research.

During cross-examination, Dr. Lattin admitted that she had an article published on neophobia work utilizing 180 hours of videos recorded for LSU research. Dr. Lattin also acknowledged having made presentations in January, March, and December 2020, as well as in January and February 2021, utilizing 204 hours of videos recorded for LSU. She also utilized 263 hours of videos recorded for LSU at two seminars in January 2021. From Dr. Lattin's perspective, she had not shared a lot of her research because the presentations were at conferences where she usually showed a graph or two from a project. Nothing in Dr. Lattin's testimony or the record established whether the sets of 180 hours, 204 hours, and 263 hours were replicated or distinct video recordings.

Based on Dr. Lattin's testimony, we find that LSU has established that her research may lead to patentable or licensable data, records, or information. We disagree with the trial court's finding that to demonstrate data, records, or information is of "a patentable or licensable nature" Dr. Lattin must have already contacted the Office of Research and Economic Development or present a witness other than herself to so establish. In light of the broad language utilized by the legislature in fashioning the exemption set forth in La. R.S. 44:4(16)(b), it is

15

evident the purpose of the exemption is to afford the broadest protections to those engaged in research.

Allowing broad protection as established by the legislature's language in providing for the exemption does not end our inquiry. The legislature recognized that once data, information, and records have been publicly released, published, or patented, the protection from the Public Records Law is no longer necessary. Because Dr. Lattin acknowledged she has published 180 hours in conjunction with the article, "No, you go first: phenotype and social context affect house sparrow neophobia"; 204 hours of videos with multiple presentations between January 2020 and February 2021; and 263 hours in two presentations in January 2021, these video recordings are not exempt from production under La. R.S. 44:4(16)(b) because they have been publicly released or published.

Although on appeal, LSU maintains that Dr. Lattin testified the videos could not be edited to produce only the published data, we do not agree. Dr. Lattin stated that the raw data consisted of instances where a bird would feed from a food dish quickly and other instances where a bird would not such that the entire video had to be watched to determine whether the bird ate in the presence of a novel object. Thus, she stated, "there is really no way to edit out that particular behavior." But Dr. Lattin did not explicitly state that the published hours of video recordings could not be segregated from the entire 647+ hours of video recordings of her experiments using birds. Therefore, we agree with that portion of the trial court's order, which directed LSU to produce to PETA the publicly released hours of video recordings. But we amend the trial court's order to exclude from production the video recordings that have not been released or published.

## Other Records:

LSU asserts the trial court erred in ordering it to produce a copy of all records of the amendment to the City's ordinance as set forth in PETA's seventh PRR. In the seventh PRR, PETA expressly stated, "Please note that the response should include, but is not limited to, communications on personal devices of LSU employees as well as communication platforms such as Slack." LSU maintains the trial court erred to the extent that "records relating to Dr. Lattin's hiring of private counsel" were included within the order.

The definition of a "public record" includes an email, if that email is used in the performance of any work, duty, or function of a public body, under the authority of state or local law. *Brumfield v. Village of Tangipahoa*, 2021-0082 (La. App. 1st Cir. 12/20/21), 340 So.3d 221, 230 (citing *Shane v. Par. of Jefferson*, 2014-2225 (La. 12/8/15), 209 So.3d 726, 735-37).[11] Thus, this court held that a text message was included as "public record" subject to production by a PRR if that text message was used in the performance of any work, duty, or function of a public body, under the authority of state or local law. Otherwise, a public official could evade the law simply by communicating about sensitive public matters through a personal device and routinely escaping public scrutiny. See *Brumfield*, 340 So.3d at 230. Accord *City of San Jose v. Superior Court*, 2 Cal.5th 608, 625, 214 Cal.Rptr.3d 274, 389 P.3d 848, 858 (2017) (under California law, concluding a city employee's communications related to the conduct of public business do not cease to be public records just because they were sent or received using a personal account); *Toensing v. Attorney General*, 206 Vt. 1, 13, 178 A.3d

---

[11] We note, however, as the court did in *Brumfield*, 340 So.3d at 230 n.7, the Louisiana Attorney General has opined that "e-mails of a purely personal nature received or transmitted by a public employee which have no relation to any function of a public office are not 'public records' as described by the Public Records [Law]." *Shane*, 209 So.3d at 746 (Johnson, C.J., concurring, and citing to La. Att'y Gen. Op. No. 2010-0272 (April 13, 2011)).

17

1000, 1007 (2017) (concluding Vermont's public records law's definition of public record does not exclude otherwise qualifying records on the basis that they are located in state employee's private account); *Nissen v. Pierce County*, 183 Wash.2d 863, 881, 357 P.3d 45, 55-56 (2015) (concluding Washington's public records law reached records "prepared, owned, used, or retain[ed]" by state employees in the course of their jobs, including the work product of public employees found on their personal cell phones, such as text messages), as noted by the *Brumfield* court.

By including Dr. Lattin's "hiring of private counsel" within the scope of its order directing LSU to produce communications on its employees' personal devices as well as communication platforms, the trial court implicitly found that her hiring of private counsel was used in the performance of LSU's work, duty, or function. An amendment allowing an exception to the bird sanctuary ordinance that then permitted Dr. Lattin to trap birds within the geographic location of the city where her employer, laboratory, and the enclosure housing the birds with which she experiments is located relates to the work, duty, or function of LSU. Thus, applying a manifest error standard to the trial court's implicit factual finding that records pertaining to Dr. Lattin's hiring of private counsel related to the performance of the work, duty, or function of LSU, we cannot say the trial court was clearly wrong in its order directing LSU to produce the records of the amendment to the City's ordinance.

LSU also complains that the trial court erred in failing to conclude that the requests PETA made in its fifth PRR, seeking the trapping records, as well as its seventh PRR, seeking the records of the amendment to the City's ordinance, were unduly burdensome. LSU urges these orders constituted reversible error by the trial court.

18

Under the Public Records Law, the custodian shall present any public record to any person of the age of majority who so requests. La. R.S. 44:32. The mere fact that the public records requested may contain nonpublic material is not a valid reason for restricting access to that record. A claim of undue burden is not enough to overcome the public's right of access to public records. Although the examination of public records or requests for reproduction cannot be so burdensome as to interfere with the operation of the custodian's constitutional and legal duties, any restriction or limitation imposed by the custodian places the burden on the custodian to justify the restriction or limitation. La. R.S. 44:31(B)(3); *Krielow v. Louisiana State Univ. Bd. of Supervisors*, 2019-0176 (La. App. 1st Cir. 11/15/15), 290 So.3d 1194, 1202.

Carlton "Trey" Jones, who serves as Deputy General Counsel for LSU, testified that his office handles all legal matters for the LSU System, including responses to PRRs. He stated that as to the trapping records and the records of the amendment to the City's ordinance, LSU does not dispute they are subject to production under the Public Records Law. He detailed how his office had worked with PETA to narrow the terms so as to yield an amount of data that his office could review. Jones explained the most recent search, conducted the day before the trial, yielded 27 pages of results for one suggested term and 638 for the other. According to Jones, his office was in the process of reviewing those records for responsiveness so as to remove privileged and protected data. He was hopeful that what LSU offered to PETA would fulfill the requests of the fifth and seventh PRRs, but if not, LSU was "absolutely" committed to producing the records and would continue to work with PETA to narrow down the search terms until a responsive result was provided.

19

Based on the evidence in this record, we cannot say the trial court erred in failing to find PETA's fifth and seventh PRRs unduly burdensome so as to warrant the nonproduction of the requested records.[12] LSU offered no evidence showing that the requests for production were so burdensome as to interfere with the operation of LSU's constitutional and legal duties. Accordingly, we find the trial court correctly ordered LSU to produce records responsive to PETA's fifth and seventh PRR.[13]

## DECREE

For these reasons, those portions of the judgment ordering LSU to produce veterinary care records, consisting of daily observation reports, daily health check records, veterinarian's records, adverse event reports, medical care records, cage cards, and disposition records for birds held in Dr. Lattin's lab, from September 1, 2018 through August 5, 2019 (second PRR); from September 1, 2018 onward (third PRR); from January 1, 2020 onward (including those of Keegan Stansberry, Melanie Kimble, and Dr. Lattin) (fourth PRR); and from April 15, 2020 onward (eighth PRR), are affirmed. That portion of the judgment ordering LSU to produce videographic records related to experiments carried out by Dr. Lattin funded by the grant "The Neurobiology of Resilience to Environmental Challenges" and any

---

[12] Because the trial court bifurcated the liability portion of this matter from PETA's right to other statutory relief under La. R.S. 44:35, we make no determination regarding the reasonableness or arbitrariness of LSU's responses to the trapping records and the records of the amendment to the City's ordinance.

[13] LSU suggests that the trial court erred in adopting PETA's post-trial memorandum as written reasons for judgment as well as in issuing the additional reasons for judgment drafted by PETA. LSU requests this court disregard both items and consider only the trial court's transcribed oral reasons for judgment. See *King v. Allen Court Apartments II*, 2015-0858 (La. App. 1st Cir. 12/23/15), 185 So.3d 835, 838-39, writ denied, 2016-0148 (La. 3/14/16), 189 So.3d 1069 (declining to rule on whether such an adoption of reasons by the trial court complies with the mandate of La. C.C.P. art. 1917(A), observing that the lack of a penalty in Article 1917 for failure to comply with the mandate, but recognizing the better course is for a trial judge to author any reasons for judgment thereby giving the reviewing court the benefits of his or her thoughts and insights). Having resolved the issues raised in this appeal without reliance on either the adopted post-trial memorandum or the separate written reasons for judgment drafted by PETA, we find it unnecessary to address this issue and pretermit such a discussion.

inventories, indexes, or catalogs of photographic or videographic records produced at and maintained by LSU related to and/or depicting Dr. Lattin's use of animals in experiments or research, including videos produced by LSU's faculty and staff is reversed. That portion of the judgment ordering LSU to produce to PETA all videographic records of birds held and/or used by Dr. Lattin or any other person under her supervision from September 1, 2019 onward is amended to state:

> LSU shall produce to PETA for the period from September 1, 2019 onward all photographic and videographic records of birds held and/or used by Dr. Lattin or any person under her supervision which have previously been published, which include 180 hours in conjunction with the article, "No, you go first: phenotype and social context affect house sparrow neophobia"; 204 hours of videos with multiple presentations between January 2020 and February 2021; and 263 hours in two presentations in January 2021.

In all other respects, the trial court's judgment is affirmed.[14] Appeal costs in the total amount of $7,466.00 are assessed one-half to defendant-appellant, Board of Supervisors of Louisiana State University and Thomas C. Galligan, individually and in his capacity as an interim president of Louisiana State University, and one-half to plaintiff-appellee, People for the Ethical Treatment of Animals.

**AMENDED AND, AS AMENDED, AFFIRMED IN PART; REVERSED IN PART. RELIEF REQUESTED IN ANSWER DENIED.**

---

[14] PETA answered the lawsuit seeking attorney fees for defending the appeal. According to La. R.S. 44:35(D)(1):

> If a person seeking the right to inspect, copy, or reproduce a record or to receive or obtain a copy or reproduction of a public record prevails in such suit, he shall be awarded reasonable attorney fees and other costs of litigation. If such person prevails in part, the court may in its discretion award him reasonable attorney fees or an appropriate portion thereof.

In light of our disposition, reversing in part and amending in part the trial court's determinations, we decline to make an award in this appeal.

21